UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SOHEILA RAHBARI, derivatively on behalf of Nominal Defendant NexCen Brands, Inc. | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Case No. 08cv5843 (NRB) District Judge N. Buchwald |
| DAVID OROS, ROBERT W. D'LOREN, JAMES T. BRADY, PAUL CAINE, JACK B. DUNN IV, EDWARD J. MATHIAS, JACK ROVNER, GEORGE STAMAS, and MARVIN TRAUB Defendants, | ) ) ) ) ) ) ) ) | ECF CASE |
| and | ) ) | |
| NEXCEN BRANDS, INC. | ) ) | JURY TRIAL DEMANDED |
| Nominal Defendant | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by its attorneys, submits this Verified Shareholder Derivative Complaint.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiff Soheila Rahbari ("Plaintiff" or "Rahbari") for the benefit of Nominal Defendant NexCen Brands, Inc. ("NexCen" or the "Company") against Defendants David Oros, Robert W. D'Loren, James T. Brady, Paul Caine, Jack B. Dunn IV, Edward J. Mathias, Jack Rovner, George Stamas and Marvin Traub for

1

violations of their fiduciary duties owed to NexCen from May 10, 2007 through the present (the "Relevant Period").[1]

2.      Throughout the Relevant Period, the Defendants failed to disclose and misrepresented the following material adverse facts which were known to Defendants or recklessly disregarded by them: (1) that in order to finance its Great American Cookies acquisition, the Company agreed to an accelerated-redemption feature, which forced the Company to pay back half of the amount borrowed by a particular date; (2) that the Company could not comply with the accelerated-redemption feature; (3) that as a result, the Company would suffer a reduction in the amount of cash at its disposal; (4) that the Company was experiencing a continuous weakening in its financial condition due to its debt; (5) that the Company lacked adequate internal and financial controls; and (6) that, as a result of the foregoing, the Company's statements about its financial well- being and future business prospects were lacking in any reasonable basis when made.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

4.      This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

5.      Venue is proper in this district pursuant to 28 U.S.C. §1391(a) because a substantial portion of transactions and wrongs complained of herein occurred in this district.

---

[1] Because Defendants have failed to take action to remedy the breaches of fiduciary duties that occurred between May 10, 2007 and May 19, 2008, the Relevant Period continues through this day instead of ceasing on May 18, 2008, the day before the public became aware of the wrongdoings at the Company.

2

Further, Defendants either reside or participated in board of director meetings or maintain executive offices in this district and have received substantial compensation in this district by engaging in numerous activities and conducting business in this district.    Further, NexCen maintains its principal place of business in this district.

## PARTIES

6.    Plaintiff Soheila Rahbari, as set forth in the Verification, is and was during the Relevant Period, a shareholder of NexCen.  Plaintiff is a citizen of the State of New Jersey.

7.    Nominal Defendant NexCen acquires and manages global brands, generating revenue through licensing and franchising.  It currently owns and licenses Bill Blass and Waverly brands, as well as seven franchised brands. The Athlete's Foot and Shoebox New York, two of NexCen's franchised brands, sell retail footwear and accessories.  The remaining five franchised brands – Marble Slab Creamery, MaggieMoo's, Pretzel Time, Pretzelmaker, and Great American Cookies -- are quick-service restaurants.  NexCen is incorporated in the State of Delaware and its principal executive offices are located at 1330 Avenue of the Americas, 40th Floor, New York, NY 10019-5400.

8.    Defendant David Oros ("Oros") upon information and belief is a citizen of the State of New York.  Oros, founded the Company, and at all relevant times, served as the Chairman of the Board of Directors and is the former Chief Executive Officer.  Oros is considered to be an employee of NexCen.

9.    Defendant Robert W. D'Loren ("D'Loren") upon information and belief is a citizen of the State of New York.  D'Loren, at relevant times, served as the President and Chief Executive Officer.  D'Loren also served as a member of the Board of Directors. D'Loren is considered to be an employee of NexCen.

3

10.     Defendant James T. Brady ("Brady") upon information and belief is a citizen of the State of New York.  Brady, at all relevant times, served as the Chairperson of the Audit Committee, Chairperson of the Nominating and Corporate Governance Committee and is a member of the Board of Directors.  The Board of Directs has also determined that Defendant Brady is an audit committee financial expert, as defined by Item 407 of Regulation S-K and as required by Nasdaq Rule 4350(d).

11.     Defendant Paul Caine ("Caine") upon information and belief is a citizen of the State of New York.  Caine, since his election to the Board on September 5, 2007, has served as a member of the Board of Directors and is a member of the Audit Committee.

12.     Defendant Jack B. Dunn IV ("Dunn") upon information and belief is a citizen of the State of New York.  Dunn, at relevant times, served as a member of the Board of Directors, on the Compensation Committee, Nominating and Corporate Governance Committee.

13.     Defendant Edward J. Mathias ("Mathias") upon information and belief is a citizen of the State of New York.  Mathias, at all relevant times, served as a member of the Board of Directors, on the Audit Committee, Nominating and Corporate Governance Committee and as Chairperson of the Compensation Committee.

14.     Defendant Jack Rovner ("Rovner") upon information and belief is a citizen of the State of New York.   Rovner, at relevant times, served as a member of the Compensation Committee and is a member of the Board of Directors.

15.     Defendant George Stamas ("Stamas") upon information and belief is a citizen of the State of New York.  Stamas, at all relevant times, served as a member of the Board of Directors.

16.    Defendant Marvin Traub ("Traub") upon information and belief is a citizen of the State of Connecticut.  Traub, at all relevant times, is a member of the Company's Board of Directors.

17.    Defendants Oros, D'Loren, Brady, Caine, Dunn, Mathias, Rovner, Stamas, and Traub are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of NexCen's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

18.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal

interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

19.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

20.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies and practices and controls of the Company. By virtue of such duties the Individual Defendants were required to, *inter alia*:

   a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b.    exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirement, and all contractual obligations, including acting only within the scope of its legal authority;

   c.    exercise good faith in taking action to correct any misconduct and prevent its recurrence when placed on notice of improper or imprudent conduct by the Company and/or its employees.

21.    The Individual Defendants, particularly the members of the Audit Committee, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Relevant Period

22.    During the Relevant Time Period, Defendants publicly issued false and misleading statements and failed to disclose material facts necessary to make Defendants' statements not false and misleading.

23.    The Relevant Period begins on May 10, 2007. On this day, the Company issued a press release entitled "NexCen Brands Reports First Quarter 2007 Results." Therein, the Company, in relevant part, stated:

> NexCen Brands, Inc. (Nasdaq: NEXC)("NexCen" or the "Company") today commented on financial results for the first quarter ended March 31, 2007. The Company's detailed results are included in its Quarterly Report on Form 10-Q which was filed with the SEC today.
>
> **First Quarter Ended March 31, 2007**
>
> The results for the first quarter include: (a) The Athlete's Foot ("TAF") for the entire quarter, (b) Bill Blass from February 15 (date of acquisition), and (c) MaggieMoo's and Marble Slab from February 28 (their date of acquisition).
>
> *Licensing, royalty and franchise fee revenues totaled $3.9 million for the quarter.*
>
> *Net loss, which includes income from discontinued operations of $447,000, was ($198,000).* The net loss per share calculates to $0.00. Included in the net loss is stock compensation expense of $640,000, or $0.01 per share.
>
> **Other Company News**
>
> In a separate press release issued earlier this month, the Company announced that it has completed the acquisition of the Waverly brand for $36.75 million in cash and the issuance of a warrant for the purchase of 50,000 common shares.

7

Robert D'Loren, President and CEO of NexCen Brands, Inc. commented, "I am pleased with the continued growth in our brand portfolio. We made great progress in the quarter in integrating our existing portfolio of brands, as well as, with respect to entering into a definitive agreement to acquire a leading home furnishings brand, Waverly. On an annualized basis, Waverly generates $9 million in royalty revenue, diversifies our brand portfolio and compliments our Bill Blass home business. Also, we have new franchise agreements for The Athlete's Foot in 3 countries, Sweden, Egypt, and Lebanon. In the past 9 months, we have acquired 5 brands that are expected to generate in excess of $1 billion in annual retail sales that consists of over 1,150 franchised stores, with over 500 new stores in the pipeline, we now conduct business in 45 countries. *We remain focused on executing our business plan of leveraging our brands across our three operating verticals to generate organic and synergistic growth and plan to continue on our course of acquiring from 3 to 5 companies per year."*

**2007 Guidance**

Taking into account revenue generated by the Company's existing brands, including Waverly, *the Company is reaffirming revenue guidance for the full year of 2007 of between $38 and $42 million and EPS guidance of $0.12 to $0.14 per fully diluted share.* These amounts do not reflect any additional acquisitions that might be completed in 2007, although the Company anticipates that it will continue to make acquisitions through the remainder of 2007. *Assuming that no other acquisitions are completed, the Company estimates that EPS would be $0.19 to $0.21 per fully diluted share on a forward twelve month basis.* [Emphasis added.]

24.    On August 6, 2007, the Company issued a press release entitled "NexCen Brands

Accesses $22 Million of Existing $150 Million Debt Facility to Finance Intellectual Property

Assets of Waverly." Therein, the Company, in relevant part, stated:

*NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen") announced today that it has drawn down $22 million from its existing $150 million debt financing facility to finance the intellectual property (IP) assets of Waverly, one of the most recognized brands in home furnishings.* As previously announced, NexCen entered into a master loan agreement arranged by BTMU Capital Corporation to support the Company's strategic goals by providing capital for

the acquisition of IP centric companies in its three operating verticals.

Robert W. D'Loren, President and CEO of NexCen, commented, *"With an established financing platform firmly in place, NexCen can successfully complete transactions that could otherwise be more difficult to conclude.* We are confident that this facility will continue to give us the ability to grow and execute our business plan."

The master loan agreement with BTMU Capital Corporation allows for borrowings up to $150 million. Draws under the agreement of $26.5 million and $27.3 million were used to leverage NexCen's acquisitions of The Athlete's Foot and Bill Blass, respectively. The Waverly draw-down was on terms consistent with the existing agreement of LIBOR plus 240 basis points, or approximately 7.75%, payable in five years.

Theodore J. Gaffney, Executive Vice President of BTMU Capital Corporation, commented: "We are excited about our growing relationship with NexCen Brands and its recent business activities. This facility is a win-win for both parties in that it will allow NexCen to continue to finance future acquisitions under the terms of the master loan agreement and build a well-diversified pool of assets. Once an adequate level of diversity is achieved, it will allow us to arrange a refinancing through a term loan facility." [Emphasis added.]

25.    On August 7, 2007, the Company issued a press release entitled "NexCen Brands Acquires Pretzel Time and Pretzelmaker Franchise Concepts." Therein, the Company, in relevant part, stated:

NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen") announced today that it has acquired the assets of Pretzel Time Franchising, LLC ("Pretzel Time") and Pretzelmaker Franchising, LLC ("Pretzelmaker"), which are wholly owned subsidiaries of Mrs. Fields Famous Brands, LLC ("Mrs. Fields"). *The combined purchase price for the transaction is $29.4 million, and consists of $22.1 million of cash, and NexCen common stock valued at approximately $7.3 million.* These transactions double the number of brands in NexCen's quick service restaurant (QSR) portfolio, which also includes the premium, hand-mixed ice cream chains MaggieMoo's and Marble Slab Creamery. [Emphasis added.]

26.    On August 9, 2007, the Company issued a press release entitled "NexCen Brands

Reports Second Quarter 2007 Results." Therein, the Company, in relevant part, stated:

> NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen") today reported
> its financial results for the second quarter ended June 30, 2007.
> Commenting on the quarter, Robert D'Loren, President and CEO
> of NexCen Brands, Inc., noted, *"I am extremely gratified by the
> extent of our accomplishments and our ability to quickly become
> operationally profitable.* During the quarter, we directed a
> considerable amount of effort toward building NexCen's operating
> infrastructure and improving the depth of our management team,
> including the addition of new presidents in our QSR and home
> businesses. It is important for shareholders to understand that our
> goal is to make accretive and synergistic acquisitions, and to
> support and grow each of our operating verticals. I believe that we
> made great strides in advancing these goals during the quarter."
>
> Mr. D'Loren further stated, *"I am pleased about the recent
> acquisition of Pretzel Time and Pretzelmaker, as these brands
> and their related products mark the beginning of the Company's
> revenue growth strategy for its ice cream QSR concepts."* For the
> quarter ended June 30, 2007, NexCen reported that total
> revenues increased to $8.9 million, compared to $3.9 million in
> the first quarter of 2007.* Income from continuing operations was
> $650,000 or $0.01 per share, compared to a loss from continuing
> operations of ($645,000) or ($0.01) per share for the first quarter of
> 2007. Income from continuing operations for the second quarter
> included stock-based compensation expense of $731,000 and
> transition costs of approximately $450,000 relating to the
> integration of the Company's franchising operations in it's Atlanta
> location, which reduced operating income by approximately $0.02
> per share. *The Company reported a net loss of ($245,000) or
> ($0.01) per diluted share for the quarter, compared to a net loss
> of ($198,000) or ($0.00) per share for Q1 2007.*
>
> As of June 30, 2007, NexCen had cash and cash equivalents of $27
> million, total assets of $273 million, long-term debt of $54 million
> and deferred revenues of $5.7 million.
>
> Mr. D'Loren concluded, "One of the most exciting events during
> the second quarter took place at our TAF Global Franchise
> Convention in Las Vegas in June, where we introduced our vision
> for the future of The Athlete's Foot ("TAF") to approximately 70

TAF franchisees, representing over 600 stores throughout the world. We presented an innovative, modular merchandising system that will allow each store location to more closely align its product offering with local demographics and buying tastes. In addition, we introduced our new line of high margin, TAF branded apparel. Both of these introductions were received enthusiastically by the franchisees in attendance. Adding to our excitement about TAF was the recent signing of an agreement with an existing TAF area developer, to open a minimum of 100 new domestic stores over the next 14 years." [Emphasis added.]

27.    On September 7, 2007, the Company issued a press release entitled "NexCen

Brands Accesses $16 Million of Existing $150 Million Debt Facility to Finance Intellectual

Property Assets of Pretzel Time and Pretzelmaker." Therein, the Company, in relevant part,

stated:

> NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen") announced today that it has *drawn down $16 million from its existing $150 million debt financing facility to finance the intellectual property (IP) assets of Pretzel Time and Pretzelmaker,* two of the most recognized brands in the premium hand rolled pretzel business that NexCen acquired in August 2007. As previously announced, NexCen entered into a master loan agreement arranged by BTMU Capital Corporation to support the Company's strategic goals by providing capital for the acquisition of IP centric companies in its three operating verticals.
>
> Robert W. D'Loren, President and CEO of NexCen, commented, *"With an established financing platform firmly in place, NexCen can successfully complete transactions that would otherwise be more difficult to conclude. We are confident that this facility will continue to give us the ability to grow and execute our business plan."* [Emphasis added.]

28.    On November 8, 2007, the Company issued a press release entitled "NexCen

Brands Reports Third Quarter 2007 Results," wherein it announced quarterly total revenues of

$11.4 million and net income of $117,000. Additionally, the Company, in relevant part, stated:

> Commenting on the quarter, Robert D'Loren, President and CEO of NexCen Brands, Inc., noted, "I am extremely pleased with the

favorable advancements of our company during the third quarter. *The investments we have made in our brands, people and infrastructure are now beginning to show results. I remain confident that we have developed an extremely robust and scaleable operating platform from which to grow our business."*

"During the quarter, we experienced positive momentum within each of our operating segments," continued Mr. D'Loren. In retail franchising, our rebranding efforts at The Athlete's Foot (TAF) have been met with strong acceptance as evidenced by the signing of three separate area development agreements to open a minimum of 130 stores in the United States and Sweden. In addition, we are delighted to have aligned ourselves with Li & Fung, a global supply chain manager to retailers, to serve as our manufacturing and distribution partner for Taftec(TM), the new TAF branded apparel line. In our quick service restaurant (QSR) segment, we acquired Pretzel Time and Pretzelmaker, doubling the number of brands in our QSR portfolio, which provides us strong crossselling opportunities within our existing locations. In our consumer branded products segment, Bill Blass significantly advanced its licensing efforts, first through a licensing agreement with The Global Fur Group to manufacture and distribute luxury fur products under the Bill Blass label; and second through an exclusive licensing agreement with Mondani to manufacture and distribute handbags, small leather goods and cosmetic toiletry cases. We believe these agreements reflect the underlying strength of the Bill Blass brand and our ability to broaden the scope of this preeminent name in luxury fashion."

The results for the third quarter of 2007 included: (a) The Athlete's Foot, Bill Blass, MaggieMoo's, Marble Slab and Waverly for the entire quarter, and (b) Pretzel Time and Pretzelmaker since August 7 (the date of acquisition), or less than 60 days.

The results for the first nine months of 2007 included: (a) The Athlete's Foot for the entire nine months, (b) Bill Blass from February 15 (date of acquisition), (c) MaggieMoo's and Marble Slab from February 28 (date of acquisition) (d) Waverly from May 2 (date of acquisition) and (e) Pretzel Time and Pretzelmaker from August 7 (date of acquisition). The Company did not own any of these brands during the first nine months of 2006.

\* \* \*

**Guidance**

12

> *The company expects full year Non-GAAP net income to be in the range of $0.11 to $0.13 per diluted share for 2007 and $0.19 to $0.21 per diluted share for 2008, assuming no additional acquisitions.* [Emphasis added.]

29.   On January 29, 2008, the Company issued a press release entitled "NexCen Brands Acquires the Great American Cookie Company(R) From Mrs. Fields Famous Brands." Therein, the Company, in relevant part, stated:

> *NexCen Brands, Inc. (Nasdaq: NEXC) ("NexCen") announced today that it has acquired the Great American Cookie Company ("Great American Cookies") from Mrs. Fields Famous Brands, LLC ("Mrs. Fields"). The purchase price of the transaction is $93.7 million, and consists of approximately $89.0 million of cash and NexCen common stock valued at approximately $4.7 million.* This transaction adds another premium treat brand to the four brands in NexCen's quick service restaurant (QSR) portfolio, which include the premium, hand-mixed ice cream chains MaggieMoo's and Marble Slab Creamery, as well as the handrolled pretzel chains Pretzel Time and Pretzelmaker. The Great American cookies acquisition marks the ninth brand added to NexCen Brands ortfolio and increases its franchise locations from 1,600 to 1,900 locations worldwide.
>
> Founded in 1977, the Great American Cookie Company provides cookies, cupcakes, brownies, and smoothies to a diverse and loyal customer base. The company has demonstrated more than 30 years of consistent growth and is the number one mall-based cookie system in the United States. As of December 31, 2007, Great American Cookies had nearly 300 franchised units primarily located in the continental United States.
>
> Commenting on the acquisition, Robert W. D'Loren, President and CEO of NexCen, stated, *"Great American Cookies is a great opportunity for us to enter the cookie business with a premium cookie brand that has grown consistently over the years. The brand is representative of the acquisition opportunities NexCen has targeted to grow our QSR segment and to increase sales in our existing ice cream and pretzel concepts. The addition of this brand to our QSR portfolio provides NexCen with nearly 300 additional doors for the delivery of quality treat products, and*

*broadens our franchise offering for interested franchisees, both domestically and internationally."*

Stephen Russo, President and Chief Executive Officer of Mrs. Fields, added, "NexCen Brands' acquisition of Great American Cookies will enable Mrs. Fields to focus on our core business strategy, with the comfort and belief that NexCen's franchise model will continue to build this brand. We are exploring opportunities to make additional investments in our brands in accordance with our indenture requirements, and are pleased with our progress to date."

*For a portion of the purchase price, NexCen accessed its debt facility with BTMU Capital Corporation, which was increased from $150 million to $181 million.* Theodore J. Gaffney, Executive Vice President of BTMU Capital Corporation, commented: *"We are pleased with our relationship with NexCen Brands and its recent business activities. Our facility has continued to allow NexCen to finance its acquisitions under the terms of the master loan agreement and build a well diversified pool of assets."*

\* \* \*

**2008 Guidance**

*The Company has revised its guidance to non-GAAP EPS range of $0.27 - $0.30 per share.* [Emphasis added.]

30.    On March 14, 2008, the Company issued a press release entitled "NexCen Brands

Reports 2007 Financial Results." Therein, the Company, in relevant part, stated:

NexCen Brands, Inc. (Nasdaq: NEXC) recorded revenue of $34.4 million in 2007, its first full year of brand-management operations. This compares to $1.9 million in 2006, which included less than two months of comparable operations with just one brand.

On a GAAP basis, the company recorded a net loss of $4.6 million, or $0.09 per share, for 2007.

On a non-GAAP basis, we earned $4.9 million, or $0.09 per diluted share. This excludes the non-cash expenses of depreciation and amortization, stock based compensation, and the provision for deferred income taxes; as well as the loss from discontinued

operations. EBITDA, as adjusted, was $8.8 million, or 26 percent of revenue. Schedules that reconcile non-GAAP measures to the most comparable GAAP measures are attached.

*For the fourth quarter of 2007, revenue was $10.3 million, up from $1.9 million in the fourth quarter of 2006. On a GAAP basis, the net loss for the quarter was $3.8 million, or $0.07 per share. On a non-GAAP basis, net income was $0.3 million.*

*"We have now completed the first year of our long-term plan to acquire and manage internationally-recognized franchise and consumer brands, and we have made dramatic progress,"* said CEO Robert W. D'Loren. "We have acquired nine strong brands. We have assembled a first-class team of experienced professionals at NexCen - and partnered with industry-leading designers, manufacturers, and franchise operators worldwide.

*"From a financial perspective, we earned $0.09 per share on a non-GAAP basis, two cents short of our goal for 2007. But we have an additional $0.07 per share of net deferred revenue on our balance sheet, reflecting $4.7 million of franchise sales that have already been made, but cannot be recognized as revenue until the stores are opened.*

*"Looking ahead, our emphasis will be on marketing, franchise sales, and operational excellence, which will drive cash flow and profitability.* At the same time, we intend to continue to acquire complementary brands. We will maintain our disciplined approach to acquisitions, buying companies only if they immediately add to shareholder value. We are very excited about our business and the many opportunities that we are pursuing."

**Earnings Guidance**

*NexCen Brands is reaffirming the current expectations of earning $0.27 to $0.30 per diluted share on a non-GAAP basis in 2008.*

***

**Acquisition Financing**

*Our objective is to acquire from three to five brands per year in 2008 and 2009. Our acquisitions are financed with a combination of debt, cash on hand, and stock. We currently have*

> *borrowed the full amount under our $180 million credit facility with BTMU Capital Corporation. We are exploring opportunities to convert this credit facility into a long-term, fixed-rate security.* Our management team has a successful track record of underwriting and placing securities of this nature in various economic environments. Therefore, we expect to continue to have access to capital. [Emphasis added.]

31.    On this news, shares of the Company stock fell $0.67 per share, or 20% over the next four (4) trading days, to close at $2.83 per share.

32.    On March 21, 2008, the Company announced that Kenneth J. Hall was appointed to replace David Meister as Executive Vice President, Chief Financial Officer and Treasurer.

33.    On or about March 21, 2008, NexCen filed its Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Individual Defendants, and, in relevant part, stated:

### Great American Cookies

On January 29, 2008, we acquired substantially all of the assets of Great American Cookie Company Franchising, LLC and Great American Manufacturing, LLC for the purchase price of approximately $93.65 million, consisting of $89 million in cash and $4.65 million of our common stock (approximately 1.1 million shares which were valued at $4.23 per share, the closing price per share of our common stock the day immediately prior to the closing date. To finance the acquisition, we borrowed $70 million under the BTMU Credit Facility, which was increased from $150 million to $181 million at that time.

Our total borrowing to date under the BTMU Credit Facility is approximately $181 million. Repayments of our borrowings through December 31, 2007 totaled $1.2 million. For a discussion of risks associated with borrowings, see Item 1A. Risk Factors under the caption "Risks of Our Business - Any failure to meet our debt obligations would adversely affect our business and financial condition."

\* \* \*

*Any failure to meet our debt obligations would adversely affect our business and financial condition.*

On March 12, 2007, we entered into a $150 million master loan agreement with BTMU Capital Corporation ("BTMU"). In connection with the financing of our acquisition of Great American Cookies on January 29, 2008, we increased the maximum amount of borrowing that may be outstanding at any one time from $150 million to $181 million and modified certain defined terms used in the original loan documentation and related documents to take into account the Company's acquisition of real estate assets in the Great American Cookies transaction. *With the exception of these changes, the increase to the BTMU Credit Facility is substantially on the same terms as the original credit facility.*

As of March 14, 2008, we have approximately $179 million of long-term debt outstanding under the master loan agreement with BTMU. Interest rates for our master loan agreement vary based upon changes in the debt service coverage ratio, which is the outstanding balance compared to operating revenue of the underlying collateral, and based changes in the London Interbank Offering Rate ("LIBOR").

Our master loan agreement contains affirmative and negative covenants customary for senior secured credit facilities, including, among other things, restrictions on indebtedness, liens, fundamental changes, loans, acquisitions, capital expenditures, restricted payments, transactions with affiliates, common stock repurchases, dividends and other payment restrictions affecting subsidiaries and sale leaseback transactions. Although these covenants are limited to the collateral-holding entities and do not apply to the Company itself, our failure to comply with the financial and other restrictive covenants relating to our indebtedness could result in a default under the indebtedness, which could materially adversely affect our business, financial condition and results of operations. These restrictions may also limit our ability to operate our businesses and may prohibit or limit our ability to enhance our operations or take advantage of potential business opportunities as they arise.

As a result of our indebtedness, a substantial portion of cash flow from our operations is needed to pay principal and interest. This reduces the cash available to finance our operations and other business activities and could limit our flexibility in planning for or reacting to changes in our business. Although the master loan agreement does not restrict our ability to obtain future financings, it may limit our ability to do so, which could negatively impact our

business, financial condition, results of operations and growth. The amount of our debt may also cause us to be more vulnerable to economic downturns and adverse developments in our business.

* * *

As of December 31, 2007, we had available cash on hand of approximately $46 million. We used approximately $22 million of this balance in connection with the acquisition of Great American Cookies in January 2008. We were able to increase our BTMU Credit Facility to $181 million (as discussed below) to finance the remainder of the acquisition costs. *We anticipate that cash on hand and cash generated from operations will provide us with sufficient liquidity to meet the expenses of operations, including our debt service obligations, for at least the next twelve months.* As discussed below, additional sources of capital will be needed to fund additional acquisitions, even taking into account anticipated cash flows from operations.

***

On March 12, 2007, NexCen Acquisition Corp. ("the Issuer"), a wholly owned subsidiary of the Company, entered into a master loan agreement with BTMU Capital Corporation. This master loan agreement provides for borrowings pursuant to the issuance of a single class of notes to the Issuer and its wholly-owned subsidiaries ("Co-Issuers") which are jointly and severally liable for payments required under the notes. The assets of the Issuer and Co-Issuers, which consist of the respective IP assets and the related royalty revenues and trade receivables, are pledged as collateral security under each note, and secure the obligations of the Issuer and all Co-Issers under all of the notes. The notes are nonrecourse to NexCen Brands, Inc. Each note is repayable in full after five years. Substantially all revenues earned by the company are remitted to "lockbox accounts" that have been established in connection with the agreement (See Note 2(d)). The facility has no expiration date and can be terminated by the Co-Issuers upon thirty days notice and by BTMU Capital Corporation by electing not to fund future advances; however, each note funding maintains its respective maturity date. The agreement provides for certain restrictions on the Issuer and Co-Issuers, including limitations on payment of dividends and expenditures on fixed assets. The maximum aggregate amount of borrowings that may be outstanding at any one time under the agreement is $150 million. *In January, 2008, this limit was increased to $181 million when we acquired Great American Cookie. The borrowing rate is LIBOR plus an interest rate margin, which ranges from 1.50% to 3.00%. However, a portion of the*

> ***notes relating to Great American Cookies for $35 million is priced
> at LIBOR plus 3.50%.*** The Company may refinance all or part of the
> notes with no pre-payment penalties. This allows us to refresh
> available borrowing capacity under the facility, such as by
> completing securitization transactions involving certain of our
> acquired IP assets and using the proceeds from these transactions to
> repay notes under the master loan agreement. The borrowing rate is
> based on 3-month LIBOR which is a floating rate. The LIBOR rate
> resets every 90 days. [Emphasis added.]

34.    On this news, the Company's shares fell $1.95 per share, or 77.08 percent, to close on May 19, 2008 at $0.58 per share, on unusually heavy trading volume.

35.    On May 19, 2008, the Defendants issued a press release announcing that its recent 10-K did not take into account facts that significantly changed the amount of cash available to the Company for general use.  Such factors included the accelerated-redemption feature of its bank credit facility, in connection with the Company's acquisition of Great American Cookies. Moreover, the Defendants stated that there was substantial doubt about the Company's ability to continue as a going concern.  The Defendants stated that the Company would undergo an independent review in order to make a determination.  Finally, the Defendants announced that the Company's prior financial guidance for 2008 was no longer applicable.   The press release was entitled, "NexCen Brands Provides Business Update." Therein, the Defendants, in relevant part, stated:

> NexCen Brands, Inc. (NASDAQ:NEXC) today provided a
> business update.
>
> ***The company announced that it will delay the filing of its
> Quarterly Report on Form 10-Q for the quarter ended March 31,
> 2008 and that it expects to amend the company's Annual Report
> on Form 10-K for the fiscal year ended December 31, 2007.*** The
> company filed a Current Report on Form 8-K this morning which
> provides more detail on these matters.

*In the course of preparing its first quarter 2008 10-Q and following the appointment of its new Chief Financial Officer, the company conducted a review of its prior public filings, including the terms of the January 2008 amendments to its bank credit facility. NexCen's bank credit facility with BTMU Capital Corporation was amended in January 2008 at the time of the acquisition of the Great American Cookie business. The amendments allowed NexCen to borrow an additional $70 million to finance a portion of the acquisition purchase price and included an accelerated-redemption feature applicable to $35 million of the $70 million. Specifically, the amendments require that the $35 million be reduced to $5 million by October 17, 2008. The company concluded that disclosures regarding the accelerated-redemption feature of its bank credit facility, as well as other changes that reduced the amount of cash available to the company for general use, were not contained in the company's 2007 Annual Report on Form 10-K or the January 29, 2008 Current Report on Form 8-K filed in connection with the acquisition of Great American Cookies.*

*Based on information that is now known, the company believes that there is substantial doubt about its ability to continue as a going concern, and pending completion of an independent review discussed below, that this substantial doubt also may have existed at the time the company filed its 2007 10-K.* The company is continuing to review all of the relevant facts and circumstances. To assist in evaluating and resolving these matters, the audit committee of the company's Board of Directors has retained independent counsel to conduct an independent review of the situation. *The company has concluded that its 2007 financial statements should no longer be relied upon and no reliance should be placed upon KPMG's audit report dated March 20, 2008, or its report dated March 20, 2008 on the effectiveness of internal control over financial reporting as of December 31, 2007, as contained in the company's 2007 10-K.*

The company will determine what changes need to be made to its 2007 10-K and expects the changes may include additional footnote disclosure in the audited financial statements regarding amendments to its bank credit facility, footnote disclosure regarding going concern considerations, and updates to certain other disclosures relating to the amendments to the bank credit facility and the company's liquidity and financial condition. KPMG is also expected to amend its audit report dated March 20, 2008.

However, the company does not expect there to be any changes to its 2007 financial results.

The company is notifying The Nasdaq Stock Market that it will not timely file its first quarter 2008 10-Q with the Securities Exchange Commission. As a result of the delayed filing, NexCen will not be in compliance with the Nasdaq Marketplace Rule 4310(c)(14) that requires that the company timely file all required reports with the SEC to satisfy continued listing.

\*\*\*

**The company expects to report revenues of $13.9 million in the first quarter of 2008 compared with $3.9 million in the first quarter of 2007 and $10.2 million in the fourth quarter of 2007.**

\*\*\*

**NexCen's prior guidance for its expected financial results for 2008 is no longer applicable.** [Emphasis added.]

36.    The market reacted negatively to Defendants' belated disclosure.    Upon the release of this news, the Company's shares fell $1.95 per share, or 77.08 percent, to close on May 19, 20008 at $0.58 per share, on abnormally heavy trading volume.

37.    On May 27, 2008, the Defendants filed an SEC Form 8-K and issued a press release on May 23, 2008, entitled, "NexCen Brands Receives Notice from Nasdaq As Expected Due to Late Filing of Form 10-Q," disclosing that the Company received a Nasdaq Staff Determination letter notifying the Company that it has not complied with Nasdaq Marketplace Rule 4310(c)(14) because the Company has not timely filed its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2008, and that, as a result, the Company's common stock is subject to delisting from The Nasdaq Stock Market.

38.    On May 20, 2008, an article published in *The New York Times* by Michael Barbaro entitled, "Owner of Bill Blass faces Cash Short After Acquisition" stated that "[a]nalysts

have become skeptical of the company's [Nexcen] strategy and leadership." Eric Beder, an

analyst at Brean Murray, Carret & Company is quoted as saying, "We believe management

credibility as hit, incredibly, a new low...[i]nvestors should avoid the stock until there is some

semblance of normalcy and credibility at the company." Furthermore, Emanuel Weintraub,

president and chief executive officer of Emanuel Weintraub Associates, a retail consulting firm,

is quoted as saying, "[NexCen] has a lot of brands that should be doing well. If they are running

out of money, they are not running the company well."

39.    On May 30, 2008, the Defendants issued a press release entitled, "NexCen Brands

Provides Business Update: Retains Financial Advisor Announces Actions to Streamline

Organization In Active Discussions Regarding Financing." Therein, the Defendants stated in

relevant part that:

> The Company's Board of Directors has engaged NM Rothschild &
> Sons Ltd. to explore strategic alternatives, including the possible
> sale of one or more of its businesses.
>
> Management also confirmed today that active discussions continue
> with the Company's lender regarding possible amendments to the
> bank credit facility as well as with other potential lenders regarding
> additional financing.
>
> In addition, NexCen today announced actions to streamline the
> Company's operations, including a headcount reduction at its New
> York headquarters. These actions eliminate organizational and
> administrative expenses that do not directly contribute to the
> Company's ability to service franchisees, licensees and business
> partners. As a result of the changes, the Company has eliminated
> approximately 25% of its New York-based workforce. Reductions
> in payroll and salary deferrals are expected to reduce cash outlays
> by approximately $3 million on an annualized basis, and additional
> expense savings are anticipated.
>
> As part of the new organizational structure, Mr. Charles Zona, will
> step down from his position as Executive Vice President of
> Licensing but will remain with the Company for a transition

22

period. Mr. Rick Platt, President of NexCen Home Studios, encompassing the Waverly, Bill Blass Home and Gramercy brands, will now oversee Bill Blass. Mr. Chris Dull, President of NexCen Franchise Management, will continue to oversee the Company's franchise business.

*"These actions streamline the Company and allow us to operate more cost-effectively. We will remain committed to providing our franchisees, licensees and business partners with the highest level of service,"* stated Robert W. D'Loren, CEO of NexCen Brands. (emphasis added).

40.    On June 20, 2008, the Defendants issued a press release entitled, "NexCen Brands Provides Business Update: Enters Into Letter Agreement with BTMU Capital Corporation, Explores Possible Sale of Bill Blass and Waverly Brands, Continues Operational Restructing. Within the Company's Form 8-K filed with the SEC, the Company stated in relevant part:

NexCen Brands has entered into a letter agreement with its lender, BTMU Capital Corporation (BTMUCC), which provides the Company with near-term access to certain additional cash from its lockbox accounts and limited forbearance from certain alleged defaults under its bank borrowing facility. During the forbearance period, the Company intends to continue its discussions with BTMUCC, focused on developing a long-term solution for the Company's liquidity issues.

The letter agreement provides for the following modifications:

- The Company will be permitted to receive certain cash distributions from its lock-box accounts on a monthly, rather than quarterly, basis, following delivery of required reports.

- The Company's subsidiaries that are party to the bank borrowing facility may distribute certain cash to the Company to support operating activities in the ordinary course, including previously restricted cash that will be released from certain lock-box accounts.

- The Company has agreed to provide BTMUCC with monthly, rather than quarterly, reports of the

23

Company's operations and cash flow and additional weekly or bi-weekly status reports regarding cash flows, cost reductions, potential sales of one or more of its businesses and other business matters.

The letter agreement's forbearance period extends through July 17, 2008, although it terminates earlier if new defaults occur.

"We're very pleased to have reached an agreement with BTMUCC that provides the Company with additional near-term financial flexibility," stated Robert W. D'Loren, CEO of NexCen Brands. "Securing a long-term solution to the Company's liquidity requirements remains one of management's top priorities and this agreement is an important step in enabling us to continue to implement our operating plans for both our license and franchise businesses."

The Company is working to reach agreement with BTMUCC on a comprehensive restructuring of the bank borrowing facility including, among other things, obtaining relief from an accelerated principal payment obligation in October 2008. No such agreement has yet been reached, and there can be no assurance that any agreement will be reached and approved by the parties by July 17, 2008, or at all, on terms that will provide the Company with the additional liquidity it needs to operate its business.

The Company also announced today that its exploration of strategic alternatives is focused on a possible sale of its Bill Blass and Waverly brands. As previously announced, NexCen Brands has engaged N M Rothschild & Sons Limited to explore strategic alternatives, including the possible sale of one or more of its businesses. The Company has received numerous expressions of interest in both the Bill Blass and Waverly brands from domestic and international strategic and financial buyers and is working with Rothschild to evaluate possible transactions.

"We remain committed to providing all of our business partners with the highest level of service, including those working with our Bill Blass and Waverly brands," continued Mr. D'Loren. "We also continue to explore all options that will enhance liquidity for our operations."

NexCen Brands additionally announced that, since commencing its cost-reduction efforts four weeks ago, the Company has eliminated approximately 10% of its total workforce, with staff reductions at

both its New York and Georgia operations. These reductions in payroll and salary deferrals are expected to reduce cash outlays by approximately $3.5 million on an annualized basis, and additional expense savings are anticipated.

41.    In conjunction with the press released the Defendants issued on June 20, 2008, the Defendants also filed an SEC Form 8-K disclosing the following information that was not disclosed in the press release:

> As previously disclosed in a Current Report on Form 8-K filed on May 19, 2008, NexCen Brands, Inc. (the "Company") anticipated that, based on preliminary projections as of that date, it could face a cash shortfall in mid-to-late June 2008 and again in August 2008 absent enhancements to its liquidity, including changes to the frequency of cash disbursements from lockbox accounts under its bank borrowing facility. Since that time, the Company has been in active in discussions with BTMU Capital Corporation, its lender, regarding possible amendments to the bank borrowing facility.

***

> As part of the lockbox accounts under the Company's bank borrowing facility requirements, subsidiaries of the Company entered into customary deposit control agreements with its principal commercial bank, Bank of America. *Following the Company's announcement in May of potential cash short-falls, Bank of America advised the Company that it would terminate the deposit agreements and other treasury management services that it provides to the Company as of July 9, 2008.* The Company has been in active discussions with Bank of America to maintain the deposit control agreements. *If the Company is required to transition the deposit accounts to another commercial bank, it would cause significant disruptions to the Company's operations and potential disruptions to its bank borrowing facility, which may result in defaults or an Event of Default under the existing funding and security agreements.*

42.    As now revealed, the Company's earnings press releases, as well as its SEC filings portraying strong financial results, were materially false and misleading. As a result of these materially false and misleading statements and failures to disclose material facts, NexCen's

common stock traded at artificially inflated prices during the Relevant Period. Defendants materially misled the investing public, thereby inflating the price of NexCen common stock, by publicly issuing false and misleading statements and failed to disclose material facts necessary to make Defendants' statements, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations as detailed herein.

## DEFENDANTS' ILLEGAL INSIDER TRADING

43.    During the Relevant Period and while in possession of material undisclosed information, Defendants Oros and Dunn's stock sales were extremely suspicious as to both the timing and amount sold in comparison to Defendants' historical NexCen trading activity. Specifically, during the Relevant Period, Defendants Oros and Dunn dumped nearly all of their holdings at that time. The insider stock sales that occurred within the Relevant Period are set forth below:

| Insider | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| JACK DUNN | 5/16/2007 | 15,000 | $11.73 | $175,950 |
| | 5/17/2007 | 85,000 | $11.57 | $983.450 |
| | | 100,000 | | $1,159,400 |
| | | | | |
| DAVID OROS | 6/1/2007 | 81,736 | $13.00 | $1,062,568 |
| | 6/1/2007 | 9,704 | $13.01 | $126,249 |
| | 6/1/2007 | 5,500 | $13.05 | $71,775 |
| | 6/1/2007 | 4,300 | $13.06 | $56,158 |
| | 6/1/2007 | 3,900 | $13.02 | $50,778 |
| | 6/1/2007 | 3,300 | $13.04 | $43,032 |
| | 6/1/2007 | 2,200 | $13.03 | $28,666 |
| | 6/1/2007 | 1,900 | $13.10 | $24,890 |
| | 6/1/2007 | 1,800 | $13.08 | $23,544 |
| | 6/1/2007 | 1,254 | $13.09 | $16,415 |
| | 6/1/2007 | 800 | $13.11 | $10,488 |
| | 6/1/2007 | 400 | $13.07 | $5,228 |
| | 6/1/2007 | 100 | $13.16 | $1,316 |
| | 6/4/2007 | 12,811 | $13.00 | $166,543 |

| | 6/4/2007 | 4,989 | $13.03 | $65,007 |
|---|---|---|---|---|
| | 6/4/2007 | 3,800 | $13.01 | $49,438 |
| | 6/4/2007 | 2,300 | $13.01 | $29,923 |
| | 6/4/2007 | 1,170 | $13.04 | $15,257 |
| | 6/4/2007 | 971 | $13.05 | $12,672 |
| | 6/4/2007 | 259 | $13.02 | $3,372 |
| | 6/5/2007 | 7,356 | $12.91 | $94,966 |
| | 6/5/2007 | 3,473 | $12.90 | $44,802 |
| | 6/5/2007 | 3,060 | $12.81 | $39,199 |
| | 6/5/2007 | 2,900 | $12.82 | $37,178 |
| | 6/5/2007 | 1,300 | $13.00 | $16,900 |
| | 6/5/2007 | 800 | $13.02 | $10,416 |
| | 6/5/2007 | 700 | $12.89 | $9,023 |
| | 6/5/2007 | 700 | $12.88 | $9,016 |
| | 6/5/2007 | 700 | $12.84 | $8,988 |
| | 6/5/2007 | 400 | $12.85 | $5,140 |
| | 6/5/2007 | 200 | $12.87 | $2,574 |
| | | 164,783 | | $2,141,519 |
| | | | | |
| | **Total:** | **264,783** | | **$3,300,919** |

## DEMAND WOULD BE FUTILE

44.    All of these directors face a substantial likelihood of liability in this action because they knew their public statements in press releases and SEC filings were materially false and misleading as alleged above; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents. These directors either knew or should have known that violations of law were occurring and took no steps in a good faith effort to prevent or remedy that situation.

45.    Plaintiff brings this action derivatively in the right and for the benefit of NexCen to redress injuries suffered by NexCen as a result of the breaches of fiduciary duty by the Individual Defendants.

46.    Plaintiff will adequately and fairly represent the interests of NexCen and its shareholders in enforcing and prosecuting its rights.

47.    Plaintiff is owner of NexCen common stock and was an owner of NexCen common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

48.    Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be futile.  The board of directors currently consist of nine members:  David S. Oros (Chairman of the Board), Robert W. D'Loren (the Company's President, Chief Executive Officer, and member of the Board of Directors), James T. Brady (Chairperson of the Audit Committee and Nominating and Corporate Governance Committee), Paul Caine (member of the Audit Committee), Jack B. Dunn IV (member of the Compensation Committee, and Nominating and Corporate Governance Committee), Edward J. Mathias (member of the Audit Committee, Nominating and Corporate Governance Committee and Chairperson of the Compensation Committee), Jack Rovner (member of the Compensation Committee), George P. Stamas, and Marvin Traub.  As detailed below, each of the directors are subject to substantial liability on these derivative claims and are therefore in no position to render a disinterested judgment on whether the Company should bring them, and/or lack sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

**Additional Likelihood of Substantial Liability for the Audit and Compensation Committee Defendants and the Insider Defendants**

49.    Derivative Defendants Brady, Caine, and Mathias have enhanced responsibilities as members of the Company's Audit Committee.  That Committee was charged with direct

responsibility for the appointment, compensation and oversight of the work of the outside auditors; and the Audit Committee Charter imposed a detailed set of responsibilities and powers in connection with financial reporting and financial controls.

50.    Given the size, scope, and blatancy of the financial misrepresentation described above, the Audit Committee members either knew of the financial manipulations or turned a blind eye to them.  Such conduct is also not protected by the business judgment rule and exposes these Individual Defendants to a substantial threat of liability in this action.

51.    Defendants Dunn, Mathias, and Rovner are members of the Board's Compensation Committee.  In those positions, they approved stock option and compensation plans for senior executives and directors, pursuant to which millions of dollars were paid out by the Company based on grossly inflated financial results.

52.    Moreover, as a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, the Director Defendants knew the adverse, non-public information regarding the improper accounting.  While in possession of this material adverse, non-public, information regarding the Company, the following members of the NexCen Board participated in illegal insider selling:

> a.    Oros sold 164,783 shares of NexCen stock for proceeds of $2,141,519 while in possession of material non-public information; and
>
> b.    Dunn sold 100,000 shares of NexCen stock for proceeds of $1,159,400 while in possession of material non-public information.

Because these Defendants received a personal financial benefit from the challenged insider trading transaction, these defendants are interested.  Also, these Defendants face a substantial threat of liability for breach of their fiduciary duties for insider selling.  Since these directors

have breached their fiduciary duties and are interested, any demand upon them would have been futile.

53.    Defendant D'Loren is the Company's current President and Chief Executive Officer. His principal occupation is his employment with NexCen. In 2006, the Company paid D'Loren $427,083 in salary, $701,406 in option awards, and $40,162 in bonuses, for a total compensation of $1,168,651. For these reasons, he lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

54.    Defendant Oros is the Company's Founder and his principle source of income is based on his connection with the Company. Since his resignation as Chief Executive Officer, Oros has remained employed by the Company and he continued to receive a $200,000 yearly salary in addition to his benefits, severance payments, and stock awards. In 2006, the Company paid Oros $207,692 in salary, $111,502 in stock awards, and $37,020 in option awards for a total compensation of $356,214. For these reasons, he lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

55.    Defendant Traub lacks independence based on his position as Owner and President of Marvin Traub Associates. In July 2007, NexCen entered into an agreement with Marvin Traub Association, Inc. to assist the Company in negotiating a deal with a big box retail chain to either enter into a joint venture or purchase a license from NexCen to open MaggieMoo's ice cream locations in their stores. Marvin Traub Associates, Inc. received a $25,000 retainer fee with the potential to receive a $100,000 success fee upon completing negotiations.    Because Traub is in a position to receive compensation from NexCen's

relationship with Marvin Traub Associates, he lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

56.    Defendant Dunn lacks independence based on his position as President, Chairman, and Chief Executive Officer of FTI Consulting, Inc. In 2006, FTI provided due diligence services to the Company in connection with the acquisition of UCC. While the Company then described FTI's services as "immaterial" and of "a one-time nature," according to a press release issued on May 19, 2008, NexCen has again engaged FTI, but this time for the "review [of] the Company's cash flows and projections." Although the Board insists that Dunn remains an independent director, FTI will inevitably receive compensation for its services, and such compensation will provide outside benefits to Dunn. Because Dunn has conflicting loyalties due to his connection with FTI, he lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

57.    Likewise, Defendant Stamas lacks independence based on his directorship at FTI Consulting, Inc and his relationship with Kirkland & Ellis LLP. Similar to Dunn, Stamas is in a position to receive benefits from an outside source based on NexCen's continued relationship with FTI. Additionally, Stamas receives other compensation from his role as senior partner at Kirkland & Ellis LLP, a firm which provides legal services for several of NexCen's acquistions, including it acquisition of Bill Blass, Marble Slab Creamery, and Waverly Brands. For the years ended December 31, 2007, 2006, and 2005, the Company had outstanding payables due to Kirkland & Ellis LLP of approximately $121,000, $492,000, and $45,000, respectively. Because Stamas' motives could be influenced by the connections these companies have to NexCen,

31

Stamas lacks the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

58.    Moreover, Defendants Dunn and Stamas have a personal relationship, which creates a lack of disinterestedness. As previously mentioned, Dunn and Stamas both sit on the board of FTI, with Dunn as the Chairman. In fact, the most recent Proxy Statement for FTI classifies Stamas as "not independent based on the nature of the legal services provided by Kirkland & Ellis...." It therefore appears that Dunn and Stamas not only have a habit of sitting on the same boards together but that they also make a habit of ensuring that Stamas receive outside compensation through his position at Kirkland & Ellis. Perhaps most important to illustrating the close relationship between Dunn and Stamas can be found by examining their relationship to the Baltimore Orioles, of which both Dunn and Stamas are limited partners. According to an October 5, 1993 article entitled "The Orioles' New Owners," Dunn's connection with the team was made possible by Stamas, as it was Stamas who introduced Dunn to the Orioles' principle owner, Peter Angelos. The article further describes Stamas as "a lifelong friend" of Dunn. Given that Dunn and Stamas have a pattern of securing each other with positions in various companies and are admittedly "lifelong friend[s]", their relationship raises serious doubt about whether Dunn and Stamas would ever approve of a course of action that implicates the other. Because their loyalties would not be exclusive to the Company and the shareholders, Dunn and Stamas lack the sufficient independence with which to render a disinterested decision on whether to pursue the Derivative Claims against the Individual Defendants.

59.    Plaintiff has not made any demand on the shareholders of NexCen to institute this action since demand would be a futile and useless act for the following reasons:

a.    NexCen is a publicly held company with approximately 56.6 million shares outstanding, and thousands of shareholders;

b     Making demand on such a number of shareholders would be impossible for Plaintiff, who has on way of finding out the names, addresses or phone numbers of all the shareholders; and

c.    Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

60.    NexCen has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include, but are not limited to:

a.    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts;

b.    Costs related to the satisfaction of the Company's letter agreement with BTMU Capital Corporation;

c.    Costs related to the Company's restructuring of its bank borrowing facility,

d.    Costs related to the Company securing a long-term solution to the Company's liquidity issues.

61.    Moreover, Derivative Plaintiff has not made a demand on the board of directors to bring these causes of action because such a demand would be futile and useless act for the following additional reasons:

a.    Defendants Oros and D'Loren are not independent directors of NexCen. Oros and D'Loren are beholden to NexCen because of their employee status with NexCen. Because of this, it is reasonable to conclude that they would not authorize suit against each other.  Therefore, demand upon Defendant Directors Oros and D'Loren is futile.

b.    Defendant Traub is not a sufficiently independent director of NexCen. Traub is the Owner and President of Marvin Traub Associates. NexCen has a consulting agreement with Marvin Traub Associoates.  Therefore, demand upon Defendant Traub is futile.

33

c.    Defendant Dunn is not a sufficiently independent director of NexCen. Dunn is the President, Chairman, and CEO of FTI. NexCen has a consulting agreement with FTI. Therefore, demand upon Defendant Mendel is futile.

d.    Defendant Stamas is not a sufficiently independent director of NexCen. Stamas is a director at FTI and is a senior partner of Kirkland & Ellis LLP. NexCen has a consulting agreement with FTI and consistently receives legal services from Kirkland & Ellis. Therefore, demand upon Defendant Stamas is futile.

e.    Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.

f.    The Director Defendants of NexCen, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise accounting practices. Each of the Director Defendants exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

g.    In order to bring this suit, a majority of the Directors of NexCen would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

h.    The acts complained of constitute violations of the fiduciary duties owed by NexCen's officers and directors and these acts are incapable of ratification.

i.    NexCen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for NexCen any part of the damages NexCen suffered and will suffer thereby.

j.    The actions of the directors has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

k.    Any suit by the directors of NexCen to remedy these wrongs would likely expose the Director Defendants and NexCen to further violations of

securities laws which could result in additional civil actions being filed against one or more of the Director Defendants thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

62.     Making demand on all shareholders would also force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

## FIRST CAUSE OF ACTION

### Against Individual Defendants for Breach of Fiduciary Duty

63.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth full herein.

64.     The Individual Defendants owed and owe NexCen fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe NexCen the highest obligation of good faith, fair dealing, loyalty and due care.

65.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

66.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial condition of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

67.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, NexCen has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

68.     Plaintiff, on behalf of NexCen, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants for Abuse of Control

69.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

70.    The Individuals Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence NexCen, for which they are legally responsible.

71.    As a direct and proximate result of the Individual Defendants' abuse of control, NexCen has sustained significant damages.

72.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

73. Plaintiff, on behalf of NexCen, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Individual Defendants for Gross Mismanagement

74.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

75.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of NexCen in a manner consistent with the operations of a publicly held corporation.

76.    As direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, NexCen has sustained significant damages in excess of millions of dollars.

77.    Plaintiff, on behalf on NexCen, has no adequate remedy at law.

36

## FOURTH CAUSE OF ACTION

### Against the Individual Defendants for Waste of Corporate Assets

78.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

79.     As result of the Individual Defendants' improper conduct and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Individual Defendants have caused NexCen to waste valuable corporate assets by paying bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

80.     As a result of the waste of corporate assets, Individual Defendants are liable to the Company.

81.     Plaintiff, on behalf of NexCen, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Individual Director Defendants for Unjust Enrichment

82.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

83.     By their wrongful acts and omission, the Individual Defendants were unjustly enriched at the expense of and to the detriment of NexCen.

84.     Plaintiff, as shareholder and representative of NexCen, seeks restitution from the Individual Defendants, and seeks an order this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from their wrongful conduct and fiduciary breaches.

## SIXTH CAUSE OF ACTION

37

**Against the Individual Director Defendant Oros and Dunn for Insider Selling**

85.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth fully herein.

86.    At the time of Defendants' stock sales set forth herein, Defendants knew the information described above and sold NexCen common stock on the basis of such information.

87.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.    It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold NexCen common stock.

88.    Defendants' sale of NexCen common stock, while in possession and control of this material adverse non-public information was a breach of his fiduciary duty of loyalty and good faith.

89.    Since they used the Company's proprietary information for their own gain, this constitutes a breach of the Insider Selling Defendant's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits Defendants obtained thereby.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.    Against the Individual and Director Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual and Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive  relief as permitted by law, equity and state statutory provisions  sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of the Individual Director Defendants' trading activities or their other assets so as to ensure that Plaintiff has an effective remedy;

C.      Awarding  to NexCen restitution from  the Individual and  Director Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by these Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

William B. Federman, Esq., WF 9124
FEDERMAN & SHERWOOD
10205 North Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Fax: (405) 239-2112
wbf@federmanlaw.com

Attorneys for Plaintiff

## VERIFICATION

I, Soheila Rahbari, declare that I have reviewed the Complaint ("Complaint") prepared on behalf of **NexCen Brands, Inc. (Nasdaq: NEXC)** and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of  common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

6/29/2008
Date

_____
Signature

Soheila Rahbari